UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SAULT STE. MARIE TRIBE OF CHIPPEWA
INDIANS, et al.

      Plaintiffs,

v.                                                     Case No. 1:90-CV-611

JENNIFER M. GRANHOLM, GOVERNOR,       HON. GORDON J. QUIST
PUBLIC OFFICER, SUCCESSOR IN INTEREST
COMPANY,

      Defendant.
_____/

**OPINION**

**Issue Presented**

      This involves the interpretation of a Consent Judgment entered into between the State of Michigan (the "State") on the one hand, and several Indian tribes on the other hand. Originally, the parties had several disagreements as to the interpretation of the Consent Judgment, but they have resolved all of their disagreements except the so-called "net win" issue. Specifically, under the Consent Judgment, the tribes were to make semi-annual payments to the State "in an amount equal to eight percent (8%) of the *net win* at each casino derived from all class III electronic games of chance, as those games are defined in each class III compact." (Consent Judgment ¶ 4, Def.'s Br. Supp. Mot. Ex. 1 (italics added).) In addition, the tribes were required to make semi-annual payments to local units of state government "in the aggregate amount equal to two percent (2%) of the *net win* at each casino derived from all class III electronic games of chance, as those games are

defined in each class III compact." (*Id.* ¶ 6 (italics added).) The term "net win," as defined in the Stipulation giving rise to the Consent Judgment, is the "total amount wagered on each electronic game of chance, minus the total amount paid to players for winning wagers at said machines." (Stipulation ¶ 6, Def.'s Br. Supp. Mot. Ex. 2.) Slot machines are class III electronic games of chance.

After the entry of the Consent Judgment, the Hannahville Indian Community (the "tribe") started to give "free" tokens to put into slot machines. The free tokens cannot be used for anything other than bets on "Quicksilver" slot machines, and the Quicksilver slot machines take nothing but the free tokens. Currently, the tribe does not use tokens, but it still gives out credit cards that can be used only in the Quicksilver machines. If a player with the tokens or credit card is lucky, the machine pays "winners" with twenty-five cent coins.

In determining "net win" on which it must pay the eight and two percent, the tribe does not count the value of the Quicksilver tokens as the "total amount wagered." Rather, the tribe counts the tokens as zero value. However, the tribe counts the payouts on the Quicksilver machines as the "amount paid to players for winning wagers." The tribe's calculation of "net win" has resulted in all the Quicksilver machines showing a net loss. In contrast, if the tribe considers that the tokens have value, the Quicksilver machines will show a profit from which the State and the localities get their cut.

The State says that each token should be counted as a twenty-five cent wager. The State says treating the Quicksilver tokens as not having any value means that local units of government and the State will not collect any payment from these machines because these machines accept only Quicksilver tokens. The tribe says that it never set the value of one play on the Quicksilver machines

at twenty-five cents, even though the machine pays out in quarters. The tribe argues that Quicksilver plays are free plays, so no amount is wagered. The tribe says that the parties never considered the impact of the Quicksilver plays in determining the "net win" calculation.

The remaining issue in this case is the value, if any, of the Quicksilver tokens and credit cards.

### Decision

This court finds that the State has the best of the argument for the following reasons:

- **Interpretive Standards.** The standard for interpreting the Consent Judgment is set forth in *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372-374 (6th Cir. 1998). In essence, these documents must be interpreted as ordinary binding contracts between the parties in order to achieve the intent of the parties. The court cannot create a contract for the parties and cannot look to extrinsic testimony if the words used by the parties are clear and unambiguous. For extrinsic evidence to be relevant, it must relate to the formation of the contract. Post-hoc interpretations of the intent are irrelevant to the parties' intent at the time of the agreement.

- **Extrinsic Evidence**. In this case, the parties never contemplated the use of tokens or credit cards given to customers for playing slot machines. And the evidence cited by the tribe of current practices in other states and current accounting practices, none of which was incorporated into the agreement of the parties, is not relevant in determining the intent of the parties at the time the parties entered into the relevant agreements and judgment.

- **Unambiguous Meaning: "net win."** The terms used in the contract are unambiguous. The court disagrees with the tribe's definition of "net win" that would allow the tribe to count a Quicksilver wager as having no value while allowing the tribe to deduct payouts on the Quicksilver machines.

    1. First of all, in its brief and during oral argument, the tribe agreed with the State that the bets with Quicksilver tokens or credit cards were "wagers" as that term is defined in the Consent Judgment.

    2. The question, then, is what is being wagered in the Quicksilver machines. The something being wagered must have some value to the recipient because, at a minimum, it provides a chance to win a payout of quarters from a slot machine. This chance costs persons playing on other machines real money. The very definition of "wager" incorporates the idea of value: "**3.** The subject or terms of a bet." RANDOM HOUSE DICTIONARY 2136 (2d ed. 1987); "**1.** Money or other consideration risked on an uncertain event; a bet or gamble." BLACK'S LAW DICTIONARY 1610 (8th ed. 2004). That the tokens have value is conceded by the tribe when it says that the tokens qualify as "a representative value" and constitute wagers. (Pl.'s Br. Opp'n. Mot. at 14 & 23.)

    3. The final question is what monetary value to assign to the tokens. There is sufficient evidence in the record to assign a value of twenty-five cents per token: 1) The tribe assigns this value in handing out

these promotional packages to people who it wants to gamble in its casino when it advertises to potential customers that they will receive $20 worth of promotional cash. This package contains 80 Quicksilver tokens. 2) The tribe's internal accounting assigns a value of twenty-five cents per token. The tribe argues that just because it hands out tokens does not mean that all of the tokens are used for gambling. This court does not see how this argument helps the tribe. Just because the tokens were not used by the recipient for gambling does not deprive the tokens that were used of their value. Also, the tokens might have value to a recipient even if they were not used for gambling because the initial recipient of the tokens could trade the tokens for something that he or she thought was more valuable. Finally, to the best of this court's knowledge, tokens that are not actually placed in a machine are not counted in determining net win; so unused tokens do not affect any portion of this rationale.

- **Meaning of "total amount wagered on each electronic game of chance, minus the total amount paid to players for winning wagers at said machines."** The dispute as to the meaning of this language is whether, as the State contended at oral argument but not in its brief, the tribe must account for wagers on a machine by machine basis, or, whether, as the tribe contends, the determination must be based on the total amount of money won on the entire floor. As to this issue, the court concludes that the Quicksilver machines are to be counted like all other machines.

That is, the value of the token or the unit play of the credit card, twenty-five cents, is to be considered the amount wagered, and the payout on the Quicksilver <u>and</u> other machines is considered the amount paid.

1. While the State is correct in pointing out that the words "each" in the definition of "net win" tends to indicate that an accounting is to be done on a machine by machine basis, the entire paragraph leads to the conclusion that the payments are to be calculated as to the entire floor: 1) the first sentence says that the semi-annual percentage payments are to be "eight percent (8%) of the net win at each casino derived from <u>all</u> class III electronic games of chance."[1] (Emphasis added.) 2) The term "net win" is "the total amount wagered on each electronic game of chance, minus the total amount paid to players for winning wagers at said machines." So, even in the same sentence which refers to "each machine" in speaking of wagers, the calculation of deductions is to be made in regard to players, plural, from <u>all</u> machines, plural. There is nothing in the Stipulation or Consent Judgment that requires an accounting of the net win on a machine by machine basis; only an accounting of the amount wagered is on a machine by machine basis. It does not make sense to have wagers calculated on a machine by machine basis and player winnings calculated on a gross floor basis. Furthermore, the tribe represented

---

[1] The calculations regarding the localities two percent (2%) have the same language as the State's calculations.

       that it cannot account for its take on a machine by machine basis. Also, such machine by machine accounting does not make sense from a casino business standpoint in that it would deprive the tribe of any incentive to have a large payout from any specific machine because it could not deduct that large "loss" from "profits" made on other machines.

2. As to the deduction of the payouts on the Quicksilver machines, the definition of "net win" permits this deduction because the tribe is entitled to deduct from the total amount wagered "the total amount paid to players for winning wagers at said machines." (Stipulation at ¶ 6.)

- **Laches**. The tribe asserts the defense of laches and claims that the State had plenty of opportunities to challenge the tribe's accounting method, but it failed to do so until 2004.

> The defense of laches requires an inexcusably long delay in commencing the action which causes prejudice to the other party. However, mere delay is insufficient to establish the laches defense. Indeed, "[l]aches is a defense peculiar to courts of equity, and the doctrine is usually applied where no statute of limitations governs. However, on occasion, the doctrine is applied to bar a stale claim prior to the statute of limitations; but it should only be applied in such cases when there is gross laches in the prosecution of the claim." *Consumer Credit Union v. Hite,* 801 S.W.2d 822 (Tenn.Ct.App.1990). Similarly, the Sixth Circuit uses a strong presumption that laches will not apply when the analogous statute of limitations has not run, absent compelling reason.

*Patton v. Bearden*, 8 F.3d 343, 347-348 (6th Cir. 1993) (citations omitted).

>David Hicks, the lead auditor of Michigan Department of Treasury, testified that the 2004 audit was the first and only audit on "net win" on the Hannahville site. He states that, although Hannahville had provided various records from time to time to the State between 1995 and 2004, those records do not translate into the performance of an audit and the issuance of an audit report. The court concludes that the State has exercised due diligence in examining the tribe's records.
>
>In addition, the statute of limitations in Michigan on contract claims is six years, and the State is seeking to recover damages post 1999. Therefore, the statute of limitations has not run and laches does not apply.

For the foregoing reasons, the court will grant Defendant's Motion to Enforce Stipulation and Consent Judgment.

An Order consistent with this Opinion will be entered.


Dated: July 14, 2005                                /s/ Gordon J. Quist
                                                    GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE